**David F. KENDALL, Appellant,**

**v.**

**Kim M. KENDALL, Appellee**

**In re David F. Kendall, Relator.**

Nos. 01–09–00948–CV, 01–10–00032–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 24, 2011.

Linda Ann Hinds, Steven H. Schweitzer, Susan F. McLerran, Fullenweider Wilhite, P.C., Houston, TX, for Appellant.

Sallee S. Smyth, Richmond, TX, Stephanie E. Shapiro, Schlanger, Silver, Barg & Paine LLP, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

SHERRY RADACK, Chief Justice.

This is an appeal from a child support enforcement and modification order. Appellant David Kendall challenges the trial court's jurisdiction to enforce or modify his support obligations that originated in a New York divorce decree.[1] Alternatively, he contends the trial court abused its discretion by increasing his support obligation to an amount greater than the proven needs of the children and by ordering lump-sum child support payments without good cause. Finally, he argues the trial court erred by failing to make the findings required by Texas Family Code section 154.130 when deviating from the percentage guidelines and by including the corpus, rather than just income, of his trusts in calculating his net monthly resources.

We affirm the trial court's judgment.

## I. BACKGROUND

David and Appellee Kim Kendall were married in 1987. They have two children—a son, DK, born September 10, 1994 and a daughter, HK, born June 21, 1996.

### A. The New York Proceedings

In 1997, David filed for divorce in New York. When called for trial, the parties announced that they had reached an agreement resolving all disputed issues.

The parties' stipulations about these issues were recited into the record, acknowledged in writing by the parties, and then expressly incorporated into the written judgment ("New York Judgment").

When that judgment of divorce was signed, the parties no longer had any property in New York. David had moved to Mexico City and Kim and the children lived in Houston. The parties' stipulations thus included specific provisions for certain future disputes to be resolved in Texas, where Kim and the children live, or in another appropriate jurisdiction. Because the parties' stipulations regarding both child support and the forum for resolving future disputes are germane to this appeal, we quote several of the relevant sections here.

### 1. The Stipulations

Kim's attorney, Mr. Woronov, and David's attorney, Mr. Brenizer, recited terms of the parties' agreement on the record, which include:

MR. WORONOV: With regard to custody, the primary physical residence of the two children shall remain with the defendant wife. The plaintiff husband shall be granted reasonable and liberal visitation rights including but not limited to alternate weekends....

We understand that this Court will refer any future matters concerning visitation and custody to Texas court or any court within the Uniform Custody Jurisdiction Act which might be the home state of the children in the future.

COURT: [W]ill there be an identification of the court in Texas that handles children's matters?

[1] After the trial court entered judgment in this case, David filed a petition for writ of mandamus contending that the trial court's order was entered without subject-matter jurisdiction and that such a void order can be remedied by mandamus. Because this direct appeal from the trial court's judgment provides David an adequate appellate remedy, we deny that petition and address his jurisdiction argument here.

A: I am not familiar with the court structure in Texas.

DEFENDANT: Would it be the county where I live?

A: Yes.

MR. BRENIZER: It's my understanding that we are asking the Court to refer all future matters to whatever appropriate jurisdiction.

MR. WORONOV: The parties recognize the need for a college education for the children. And the husband in particular represents to his wife, to me and to the Court, that there is a collateral source existing for that payment; it is in the sum of at least $250,000 at the present time, pursuant to a trust instrument that is administered now out of Boston.... That he further represents that there is enough funding in that trust to pay for an undergraduate education in behalf of the children. That he promises and after—to the Court, that he will send periodic statements to the defendant of the sums in that trust throughout the education of these children....

[T]he parties agree that a private school and secondary or high school education in a private institution is acceptable and recommended by both parents. In that regard, there will be a further trust that will be funded in the sum of $100,000....

MR. BRENIZER: There are several clarifications I would like to place on the record to make sure there is no misunderstanding....

With regard to the child support, that Mr. Kendall is to pay.... [It] will continue until the age of 18 for the oldest child. At which time the, what was referred to by Mr. Woronov as the college trust—there are actually two separate trusts, one for each of the children: [HK and DK]. And those are actually well-being trust[s]. They include more than just college education. So that at the time the oldest child is 18, Mr. Kendall will stop making direct payments of child support for that child to Mrs. Kendall and the trust provisions will kick in and take over, the entire support as well as the cost of the college education. And I will also point out that there is no limit in time contained in those trust instruments so that there is no date or age by which a child must complete college.

. . . .

That's our understanding of the Stipulation.

COURT: All right, you heard the comments of counsel, is that your understanding?

MR. WORONOV: Yes, Your Honor.

. . . .

COURT: The Court will make a direction then for you to submit to the Court the necessary findings of fact, conclusions of law, exhibits, amended, pleadings, proper copy of this transcript, and I will sign a proper decree.

That will have full reference of all future matters both with regard to the matrimonial—matrimonial issue and custody issue, to the Texas court, is that correct?

MR. BRENIZER: Yes, Your Honor.

During the hearing, the Court addressed both Kim and David directly, confirming on the record that they were represented by counsel, understood and agreed to the stipulations, and would abide by their terms if incorporated into a divorce decree. Kim and David signed a written Adoption of Oral Stipulation, which confirmed their belief that "the agreement is fair, reasonable and not unconscionable" and "agree[d] to the incorporation of its terms" in the judgment.

## 2. The New York Judgment

On August 17, 1998, the New York court entered a judgment of divorce attaching and expressly incorporating all the terms of the parties' stipulations in open court, and further

ORDERED, ADJUDGED AND DE-CREED, that except for issues regarding equitable distribution, all future questions concerning child support, maintenance, enforcement, interpretation or modification of this Judgment of Divorce shall be referred to the appropriate Court in the State of Texas where the Defendant and the children of the parties reside, or any other appropriate Court having jurisdiction; and it is further

ORDERED, ADJUDGED AND DE-CREED, that within ten (10) days after entry with the County Clerk, a copy of this Judgment of Divorce shall be filed by Defendant's attorneys with the Clerk of the appropriate Court in the State of Texas where the Defendant and the children of the parties currently reside pursuant to, and if required, by the laws of the State of Texas.

Nothing in the record reflects that Kim filed the judgment in Texas within 10 days of the judgment pursuant to this last paragraph. No appeal was taken from the New York Judgment.

## B. The 1998/1999 Texas Proceedings

On December 2, 1998, David filed, in Harris County, a "Petition Incident to Divorce Seeking Jurisdiction of this Court to Consider Matters Related to Divorce and Custody," in which he requested the court modify the terms of the New York divorce degree by entering a Christmas and Thanksgiving holiday visitation schedule.[2]

David's petition referenced the New York Judgment and recited that:

The Respondent, KIM M. KEN-DALL, and the minor children of the marriage are residing in Houston, Harris County, Texas and as set out in the terms of that Judgment for Divorce, all future proceedings incident to this divorce and custody matter are to be heard in Harris County, Texas. Therefore, Harris County, Texas is the appropriate venue for this motion.

Kim countered with a "Motion to Modify Support Order" that similarly asked the court to "construe and clarify the terms of the [New York Judgment] to make them more specific." Specifically, she asked the court to clarify the location, time, and amount of payment of child support, as well as the method and conditions for David to satisfy his obligation to reimburse Kim for certain of the children's medical expenses. Kim's motion recited that the "Court has continuing, exclusive jurisdiction of this case as a result of prior proceedings."

Pursuant to an agreement, the parties' claims were submitted to an arbitrator and, on October 12, 1999, the trial court incorporated the arbitrator's decision into a "Final Order" ("1999 Order"). That order, among other things, (1) designated Kim and David as joint managing conservators of DK and HK, (2) provided a detailed possession order, (3) incorporated David's existing child support obligations and specified a wage withholding order would be entered and support would be paid through Harris County, (4) ordered David to produce to Kim copies of the children's Secondary Education Trusts ("College Trusts") as well as provide Kim

---

**2.** The parties' stipulation in the New York litigation stated that "visitation will include some time for Mr. Kendall, alternate holidays and for vacation periods, those times to be worked out."

with quarterly trust statements going forward, and (5) ordered Kim to produce to David copies of the Irrevocable Children's Trust ("Education Trust") and provide David with quarterly statements going forward. No appeal was taken from that order.

### C. The 2004/2005 Proceedings

On February 5, 2004, Kim filed, in the same Harris County court, a "Petition to Modify Parent–Child Relationship" requesting that the court's October 1999 Final Order be modified to (1) "specify specific weekends for [David's] visitation," (2) "modify or clarify" various child support provisions from the earlier order "to render them enforceable by contempt," and (3) permanently enjoin David from engaging in certain acts. The petition recited that the "Court has continuing, exclusive jurisdiction of this suit as a result of prior proceedings and in consideration of Chapters 152 and 159 of the Texas Family Code."

In response, David filed a "Counter–Petition to Modify Parent–Child Relationship" requesting modification of the "Final order ... signed by this Court in the above referred to cause on October 12, 1999." This petition requested modification of the possession order and that temporary orders be entered. These claims proceeded to trial on April 14, 2005, resulting in the court entering a comprehensive "Order in Suit to Modify Parent–Child Relationship" ("2005 Order") that included, among other things, specific provisions governing possession and travel, as well as details about David's and Kim's respective rights and obligations with regard to life insurance, health insurance, and the reimbursement of uncovered medical expenses. That order also recited that the court, "after examining the record and the evidence and argument of counsel, finds it has jurisdiction of the case and of all the

parties and that no other court has continuing, exclusive jurisdiction of this case."

### D. The 2008/2009 Proceedings

On January 7, 2008, again in Harris County, David filed a "Petition to Modify the Parent–Child Relationship" seeking modification of the court's 2005 Order to appoint David "as the person who has the right to designate the primary residency of the children." His petition recited that the court "has continuing, exclusive jurisdiction of this suit." Kim filed a counterpetition also seeking to modify the 2005 Order to increase David's child support obligation, including ordering him to pay the children's private secondary school educational expenses. That petition again recited that the "Court has continuing and exclusive jurisdiction as a result of prior proceedings." After David nonsuited his claims for affirmative relief, Kim filed a "Motion for Enforcement and Order to Appear" in which she complained that David had failed to maintain life insurance policies as mandated by the New York Judgment, and failed to provide to Kim evidence of such coverage, as required by the court's 2005 Order. Kim also asserted that, in violation of the Stipulations incorporated into the New York Judgment, David had failed establish trusts for the children that "require[d] the trustee to pay for either child's college education" and that the trust established for their daughter, HK, "lacked sufficient funding to pay for the child's undergraduate college education."

#### 1. The trial

A trial on the merits was held to the court on April 23, 2009 on Kim's claims. Primarily at issue at were (1) Kim's request that David be ordered to pay the children's high school tuition because the funds in their Education Trust were depleted (2) Kim's claim that HK's College

Trust did not contain sufficient funds to pay for her college, and (3) Kim's claim that David had failed to maintain a life insurance policy for the children as provided for in the New York Judgment.

### a. High School tuition

When the parties divorced, pursuant to their stipulations incorporated into the New York Judgment, the Education Trust (a/k/a the David F. Kendall irrevocable Children's Trust) was created. That trust, which was dedicated to the children's primary and secondary private education expenses, was funded with $100,000. Kim and her brother operate as trustees. Over the years, the trust funds have been used to pay the children's tuition and other educational expenses. The value of that Education Trust in March 2009, before the children's tuition for the 2009–2010 school year was paid, was about $20,000.

HK's eighth grade tuition for the 2009–2010 school year is $6,670. DH starts high school in Fall 2009. DK would like to attend, and has been accepted by, a private school with tuition and fees for the 2009–2010 school year of $14,100.

Both parties stipulated at trial that they want the children to go to private school and agree that the children's public school option is unsuitable. Kim presented information about her income as a nurse and her monthly budget, and she testified that she does not have the resources to pay for either HK's or DK's private schooling. She further testified that she had looked into financial aid assistance at her children's schools, but did not qualify at least in part because David's income was taken into consideration. David testified that "the children should have resources from me to go to private high school. I think I've paid them and I'm willing to pay more because the trust fund has run out, and I want to see them go to private school."

He complained, though, that Kim is a poor money manager and expressed the view that because he pays her $2,000 a month in child support, he has already paid more than the cost of a complete private school tuition. Ultimately, he testified that he should pay for 50% of the children's private high school tuition.

### b. HK's College Trust

An estate and trust expert, Stephanie Donaho, testified about the provisions and operation of seven trusts that benefit David and/or his children, including the DK College Trust, of which DK is the beneficiary, and HK College Trust, of which HK is the beneficiary. As of December 31, 2008, the DK College Trust had a balance of $571,381, and the HK College Trust had a balance of $97,765. Both trusts were established by David's father, and unrelated parties serve as trustees.

Donaho testified that the College Trusts vest the trustees with absolute discretion in matters of disbursement for the benefit of the trusts' respective beneficiaries. In other words, there is no provision "requiring them to disburse funds for college or anything else." The terms of DK's College Trust do not permit the trustees to extend money for the benefit of HK.

Kim testified at trial that she just recently received these trust documents and information about their balances and terms. She understood David's agreement in their New York stipulation that there was $250,000 dedicated to each children's college and living expenses after they reached the age of 18. David agreed that there was not—at the time the New York Judgment was entered or the time of trial—sufficient funds in the HK College Trust to pay HK's college and living expenses. He also agreed that he represented to the New York court that "a source

existed to pay for [the] children's college education." He testified to his belief, though, that while he represented the funds were currently available in the New York proceedings, the New York judgment does not actually obligate him or anyone else to pay for HK's college. He does foresee additional contributions to HK's and DK's College Trusts by himself, his current wife, and his father after HK and DK reach adulthood—the point at which he is comfortable that Kim would not somehow benefit from that money. Ultimately he testified that he believes the children's college is his and Kim's shared obligation.

### c. The Life Insurance policy

Kim testified that she had never received confirmation of David's purchase of the $200,000 life insurance policy for the benefit of the children that was required by the New York Judgment and the 2005 Order. David agreed that he never obtained the insurance because certain health problems rendered it cost prohibitive, but explained that he had instead recently arranged by letter to the trustee of one of his trusts to provide $100,000 for each child upon his death.

### d. The trial court's rulings

The trial court ruled, at the close of the hearing, that the children have basic needs beyond what is being met with the current $2,000 in child support. The court found, based on the children's situation and the public school they are zoned to, that they have a need to attend private school. The court ordered David to provide, either directly or through trust funds, the tuition and fees for the children's high school, and ordered Kim to pay all extracurricular costs associated with their education.

The court also found that David had represented to the New York court that both the DK and HK College Trusts contained $250,000, which was not true. Accordingly, the court stated it would enter an order that "reflects the representations made for the Court in New York for the kids' college education." The court indicated that it would not require David to purchase life insurance, but would fashion an alternative remedy to achieve the same security in the event of his death. Finally, the Court announced it would adjust the child support "step-down" when DK graduates high school to conform with Texas law.

### 2. The May 6, 2009 Judge's Report and May 11, 2009 Interim Order Regarding Child Support and Private School

On May 6, the court issued a report reducing several of his rulings and findings to writing. It ordered David's child support of $2,000 per month to continue until DK is emancipated, at which point it decreases by 5%. The court further ordered David to pay the children's private high school tuition directly to the schools.

The report contains a finding that David's representations to the New York Court about the assets in the children's College Trusts were not true as to HK's Trust. Accordingly, the court ordered David to "transfer assets to the [HK Trust] so that the aggregate corpus of the trust is $ 250,000." It also ordered David to change the terms of the HK and DK College Trusts to "make it mandatory that the trustees utilize the trust corpus and trust income for the undergraduate college costs" of each beneficiary.

The court further found David made false representations to the New York court about the existence of life insurance policies. Recognizing though that life insurance was cost prohibitive, the court ordered David to instead post two separate bonds, $100,000 each, for the benefit of

each child in the event of his death before they reach the age of majority.

Finally, the court ordered David to pay $41,525 in attorney's fees to Kim's attorney, finding that—as a result of these proceedings initiated by David—it was proven that he made misrepresentations to the New York court, failed to comply with obligations under the New York Judgment, and hindered and delayed the discovery process. The report also ordered David to pay the children's amicus attorney's fees.

Kim filed a motion for partial reconsideration directed at the requirement that David change the terms of the College Trusts because the trusts are not parties and David has no ability to change their terms. As an alternative, Kim requested that David be directly obligated to pay HK's undergraduate college costs and receive a credit for any sums instead paid by the HK College Trust or any other family trusts. In his response to that motion, David agreed that he did not have ability to change trust terms, but argued that Texas law did not allow the court to require him to pay any undergraduate college costs.

### 3. The October 2009 Reformed Final Order

Following additional briefing and the entry of several interim orders and an entry of judgment hearing, the trial court entered the October 29, 2009 Reformed Order Modifying Child Support and Order on Enforcement that is the subject of this appeal. ("2009 Reformed Final Order")

The court found that there has been a material and substantial change in circumstances since the 2005 Order, and that modification is in the best interest of the children. The court's order further stated that, pursuant to section 154.130 of the Texas Family Code, "application of the percentage guidelines in this case would be unjust or inappropriate." The court ordered:

- David to continue paying $2,000 per month in child support until DK is emancipated, at which time the amount steps down to $1,600; and

- David to pay, as child support, the children's private high school tuition.

Finding that David had failed to satisfy his obligation to maintain life insurance obligations as mandated by the New York Judgment, the court ordered David to deposit $100,000 per child, as security for his child support obligation, with the registry of the court to until each child graduates college or reaches the age of 25.

The court found that David's representations about HK's College Trust in the New York divorce proceeding were "not true" and that David "failed to comply with and abide by the provisions of the New York Judgment." The court accordingly ordered David to transfer funds or assets to that trust "in an amount sufficient to bring the aggregate value of that trust corpus to the amount of $250,000." David was further ordered to use his "best efforts" to cause the terms of the College Trust to be modified "to require the trustees of said trusts to disburse funds to pay each beneficiary's college education expenses, as was represented to and relied upon by Kim M. Kendall as part of the parties' Stipulations in the 1998 New York Judgment of Divorce."

Finally, the court awarded additional fees to the children's amicus attorney, with $1,000 payable by David and $170 by Kim. David was further ordered to pay $41,525.00 to Kim's attorney for "services rendered in the modification action and the proceedings to enforce the prior Texas and New York Judgments."

The court noted in its order that David has already complied with his obligation to deposit $200,000 in the court registry in lieu of life insurance, and his obligation to pay Kim's attorney $41,525.00. David timely filed a notice of appeal and superseded his obligation to transfer assets to HK's College Trust with a deposit into the court registry in lieu of a bond.

At Kim's request, following David's perfection of an appeal, the court entered an order awarding her conditional appellate fees for successfully defending any appeal to the court of appeals or the Supreme Court of Texas. The court also entered findings of facts and conclusions of law in support of the 2009 Reformed Final Order.

### E. This appeal

On appeal, David asserts that the trial court (1) "abuse[d] its discretion by assuming jurisdiction over the Counter–Petition to Modify and Motion to enforce," (2) "abuse[d] its discretion when it increased David's child support obligation to an amount greater than the proven needs of the children and included lump sum child support payments without a showing of good cause," and (3) "err[ed] by failing to make the finding requested by Texas Family Code 154.130." Finding no reversible error, we affirm.

## II. JURISDICTION

David argues that Kim's failure to register the New York Judgment in accordance with the Uniform Interstate Family Support Act ("UIFSA"), codified under Chapter 159 of the Texas Family Code, deprived the trial court of subject-matter jurisdiction to enforce or modify that foreign support order. Similarly, he contends that none of the trial court's orders over the years conferred continuing jurisdiction for the trial court to enter the 2009 Reformed Final Judgment because, David asserts, these earlier judgment all suffered

the same jurisdictional defect and are thus likewise void.

Finally, David contends that he and Kim never effectively consented in the New York proceedings to a Texas court's exercising jurisdiction to modify the support provisions of the New York Judgment. Accordingly, even if the trial court had jurisdiction to enforce the support provisions of the New York Judgment despite the lack of registration, he asserts, it was without jurisdiction to modify its terms.

In response, Kim counters "that the New York judgment has in fact been registered, in substantial compliance with UIFSA requirements." Alternatively, she contends UIFSA registration is a procedural requirement that David waived by failing to timely assert.

Kim takes issue with David's characterization of the trial court's 1999 Order and 2005 as not substantively modifying the New York Judgment's child support obligations. This is significant, according to Kim, because David never took a direct appeal from those orders in which the trial court assumed exclusive, continuing jurisdiction to modify the New York Judgment's support provisions. Thus, Kim argues, David has waived his right to challenge the validity of those prior orders.

Kim likewise disputes David's assertion that the parties did not file "consents" in the New York court authorizing the Texas courts to assume jurisdiction over support modification proceedings. She asserts the combination of the stipulations read into the record, written adoption of oral stipulation, and entry of judgment incorporating the stipulations and written adoption suffices.

Finally, both parties argue that their respective positions further the purposes of the UIFSA. According to David, in 1998, 2005, and 2009—each time Kim

sought affirmative relief in the trial court—the court was "required by law to decline jurisdiction to modify a foreign child support order." By instead exercising jurisdiction, David argues, the trial court has thwarted the primary purpose of the UIFSA, i.e., "prevent[ing] multiple courts from assuming subject-matter jurisdiction to modify a child support order, thereby insuring that only one valid child support order is in effect at one time."

Kim agrees that the primary purpose of the UIFSA "is to eliminate duplicate, conflicting orders," but she counters that "[s]ince David and Kim divorced in New York in 1998, there has never been any question raised as to whether multiple orders regarding child support applied or which state was properly exercising jurisdiction over those matters which relate to the parties' children, until now." According to Kim, "each of the underlying Texas proceedings which have been initiated and resolved since 1998 have fully satisfied the purposes that UIFSA was designed to achieve and that [it is] David's effort to challenge the trial court's jurisdiction strik[ing] at the very heart of the uniform act's goal of simplifying and streamlining child support matters."

For the reasons explained below, we reject David's jurisdictional challenge and hold that the trial court properly exercised jurisdiction to both enforce and modify the New York Judgment.

### A. Standard of Review

Subject-matter jurisdiction refers to "the court's power to decide a case." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex.2000). As such, it cannot be waived and can be raised at any point in a proceeding. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex.2000). Although David couches his argument in terms of whether the trial court abused its discretion in assuming subject-matter ju-

risdiction, such challenges are properly reviewed by this Court de novo. *E.g., Reese v. City of Hunter's Creek Village*, 95 S.W.3d 389, 391 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

### B. Relevant Statutory Provisions

The UIFSA is a uniform law, adopted by all United States jurisdictions, governing procedures nationwide for establishing, enforcing, and modifying child support orders. Under the UIFSA, a "registered order issued in another state is enforceable in the same manner and is subject to the same procedures as an order issued by a tribunal of this state." TEX. FAM.CODE ANN. § 159.603(b) (Vernon 2008). "A support order ... issued in another state is registered when the order is filed in the registering tribunal of this state." *Id.* § 159.603(a). The UIFSA provides a specific procedure for the registration of interstate support orders for both enforcement and modification purposes:

§ 159.602. Procedure to Register Order for Enforcement

(a) A support order or income-withholding order of another state may be registered in this state by sending to the appropriate tribunal in this state:

(1) a letter of transmittal to the tribunal requesting registration and enforcement;

(2) two copies, including one certified copy, of the order to be registered, including any modification of the order;

(3) a sworn statement by the person requesting registration or a certified statement by the custodian of the records showing the amount of any arrearage;

(4) the name of the obligor and, if known:

(A) the obligor's address and social security number;

(B) the name and address of the obligor's employer and any other source of income of the obligor; and

(C) a description of and the location of property of the obligor in this state not exempt from execution; and

(5) except as otherwise provided by Section 159.312, the name of the obligee and, if applicable, the person to whom support payments are to be remitted.

(b) On receipt of a request for registration, the registering tribunal shall cause the order to be filed as a foreign judgment, together with one copy of the documents and information, regardless of their form.

. . . .

*Id.* § 159.602 (enforcement); *see also id.* § 159.609 (same procedures for registration when seeking modification of foreign support order). When a support order is registered, "the registering tribunal shall notify the nonregistering party." *Id.* § 159.605(a). A copy of the registered order must be included, along with notice that a hearing must be requested within 20 days if the nonregistering party contests the validity of the judgment on certain enumerated grounds. *Id.* § 159.605; *see also id.* § 159.606 (procedures for contesting validity or enforcement of registered order). There are eight statutory defenses that can be raised by the nonregistering party: (1) the issuing court lacked personal jurisdiction over the contesting party; (2) the order was obtained by fraud; (3) the order has been vacated, suspended, or modified by a later order; (4) the issuing tribunal has stayed the order pending appeal; (5) there is a defense under the law of this state to the remedy sought; (6) full or partial payment has been made; (7) the statute of limitations precludes enforcement of alleged support arrearages; or (8) the alleged controlling order is not the controlling order. *Id.* § 159.607(a). If the contesting party does not establish any of these defenses to the validity or enforcement of the order, the foreign order is confirmed and enforceable. *Id.* § 159.607(c), § 159.603.

Registration is required, but not sufficient, when seeking to modify (rather than simply enforce) a support order of another state. *Id.* § 159.610. Another prerequisite to modification by a Texas court is generally that the petitioner seeking modification is a "nonresident of this state." *Id.* § 159.611(a)(1). Alternatively, and relied upon by Kim in this case, the court can instead find:

> this state is the state of residence of the child and the child, or a party who is an individual, is subject to the personal jurisdiction of the tribunal of this state and all of the parties who are individuals have filed in a record in the issuing tribunal consents for a tribunal of this state to modify the support order and assume continuing, exclusive jurisdiction.

*Id.* § 159.611(a)(2). "Upon issuance of an order by a tribunal of this state modifying a child support order issued in another state, the tribunal of this state becomes the tribunal of continuing, exclusive jurisdiction." *Id.* § 159.611(d). In other words, once a Texas court properly exercises jurisdiction to modify a foreign support order, that court retains jurisdiction to enter additional later modification orders.

## C. Application

Kim relies on two jurisdictional bases in support of the trial court's 2009 Reformed Final Judgment: (1) the continuing, exclusive jurisdiction obtained and exercised by the court in entering its 1999 Order and 2005 Order, and (2) her independently meeting the jurisdictional requirements to seek modification and enforcement in the

2008/2009 proceedings leading to the 2009 Reformed Final Judgment.

David was the first party to invoke the jurisdiction of the trial court with the 1998 filing of a Petition Incident to Divorce Seeking Jurisdiction of this Court to Consider Matters Related to Divorce and Custody. His filing in that proceeding, in which he sought to have the court modify certain custody provisions, includes a copy of the New York Judgment, but is silent as to "registration."[3] In response, Kim filed a Motion to Modify Support Order, which likewise attached a copy of the New York Judgment, and is likewise silent as to "registration." The resulting 2009 Order contains no jurisdictional findings or recitations, but it incorporates several of the New York Judgment's provisions.

The 2005 Order was also entered in response to the parties' cross-motions, this time both seeking modification of the 1999 Order. Unlike the 1999 Order, the 2005 Order recited that the court, "after examining the record and the evidence and argument of counsel, finds it has jurisdiction of the case and of all the parties and that no other court has continuing, exclusive jurisdiction of this case."

David argues that, in support of the trial court's jurisdiction to issue the 2009 Reformed Final Order, Kim relies only on "the continuing, exclusive jurisdiction apparently acquired '... as a result of prior proceedings.'" But, according to David, "[r]egardless of whether the 1999 Final Order or the 2005 order actually modified the child support provisions of the New York Judgment, neither order can serve as

the basis of the subject-matter jurisdiction for the 2009 Reformed Order." This is because, he contends, the trial court's "failure to acquire subject-matter jurisdiction under Section 159.611 to modify the New York child support order during the 1998–1999 and 2004–2005 litigation renders the subject orders void, prohibiting either order to serve as a basis for future subject-matter jurisdiction of the Texas Court." Specifically, he complains the earlier orders were rendered void because (1) the New York Judgment was never registered (which he characterizes as a jurisdictional prerequisite to both enforcement and modification), and (2) the parties never filed consents in New York (an additional jurisdictional prerequisite to modification).

Kim responds that the parties' both filing the New York Judgment in the 1998/1999 proceedings effectuated registration "in substantial compliance with UIFSA requirements," *See* Tex. Fam.Code Ann. § 159.602, and that David's complaints about improper registration were waived by his failure to appeal the 1999 Order. She acknowledges that subject-matter jurisdiction cannot be waived, but argues that—as a matter of first impression in Texas—this Court should conclude the procedural mechanics for registering a foreign order are procedural, not jurisdictional. She points to the two purposes of the registration: (1) providing notice of intent to rely on the foreign order, and (2) giving the opposing party the opportunity to contest the validity or enforceability of the foreign order. *See, e.g. Jolly v. Jolly*, 130 S.W.3d 783, 787 (Tenn.2004).[4] She

---

3. There is a separate registration section in the Texas Family Code applicable to "child custody determinations" that making registration of a foreign child-custody determination a statutory prerequisite to enforcement or modification of its provisions. *See* Tex. Fam. Code Ann. § 152.305(a) (Vernon 2008). There

is no indication either party ever sought registration of the New York Judgment under that section either, although both parties requested at various times that its possession provisions be modified.

4. David does not argue either of these purposes were not served in this case. Although

notes that David has not challenged the validity or enforceability of the underlying order, and that that the statute specifically excuses defects in the form of registration, which she characterizes as inconsistent with the notion that that the procedures carry jurisdictional consequences.

Finally, Kim disagrees that the trial court lacked the jurisdiction to modify the support provisions of the New York Judgment. According to Kim, the New York stipulations, incorporated into the New York Judgment, were sufficient to satisfy the requirement that the parties have filed "in the issuing tribunal consents for a tribunal of this state to modify the support order and assume continuing, exclusive jurisdiction." TEX. FAM.CODE ANN. § 159.611(a)(2).

Because the bulk of the parties' jurisdictional arguments are directed at the threshold issues of registration and consent, we first address: (1) whether registration is procedural or jurisdictional, and (2) whether the parties effectively consented to transfer of jurisdiction over support issues from New York to Texas. We then consider David's arguments in light of our resolution of those questions.

### 1. Registration

■ The parties agree that the plain language of sections 159.602 and 159.609 of the Texas Family Code require a foreign support order be registered in Texas as a prerequisite to enforcement or modification. The parties, however, disagree about what constitutes sufficient performance of that registration requirement, what the consequences of failing to register are, and when a complaint about failing to properly

register a foreign support order may be asserted.

No Texas state court has squarely addressed the issue of whether failure to comply with a UIFSA registration requirement deprives a Texas court of subject-matter jurisdiction to enforce or modify a foreign support order. But David asserts that "[j]urisdictions with statutes similar to Section 159.611 have uniformly held that the requirements of the UIFSA provision at issue must be strictly construed in order for a court to acquire subject-matter jurisdiction to modify a child support order issued by another state." In only three of the cases he cites, however, did the court characterize compliance with the registration procedures as a prerequisite to the exercise of subject-matter jurisdiction, but in each of those three cases, the court found other impediments to the exercise of jurisdiction in addition to registration deficiencies. *E.g., Auclair v. Bolderson,* 6 A.D.3d 892, 895, 775 N.Y.S.2d 121 (N.Y.App.Div.2004) (holding New York court lacked subject-matter jurisdiction to modify or enforce modification of Florida support order because the "petitioner failed to demonstrate that the Florida judgment was registered in New York" and because there "is no indication in the record ... that the parties have filed any documents in the Florida Circuit Court consenting to New York's jurisdiction" as required because petitioner was a New York resident); *Lamb v. Lamb,* 14 Neb. App. 337, 707 N.W.2d 423, 436 (2005) (holding Nebraska court lacked subject-matter jurisdiction to modify Wyoming support order because the order was not registered and because no consent was

---

not expressly articulated in his brief, it appears his complaint is only with Kim's failure to follow the technical procedures outlined in section 159.602 for registration, such as the requirement that a letter of transmittal be

sent to the court clerk "requesting registration and enforcement" along with "two copies, including one certified copy, of the order." TEX. FAM.CODE ANN. § 159.602.

filed in Wyoming as required because petitioner was Nebraska resident); *Cepukenas v. Cepukenas,* 221 Wis.2d 166, 584 N.W.2d 227, 229 (1998) (holding Wisconsin court lacked subject-matter jurisdiction to modify Virginia support order because order was not registered and because no consent was filed in Virginia as required because petitioner was a Wisconsin resident).[5]

Our own research reveals that other jurisdictions have expressly rejected the argument that specific UIFSA registration procedural requirements are jurisdictional, finding instead that the filing of foreign support order satisfies the registration requirement so long as no one was prejudiced by the failure to follow the statutory procedures. For example, in *In re Marriage of Owen and Phillips,* a Washington court rejected the argument that the petitioner's "failure to properly register deprives the court of subject matter jurisdiction," noting that after the foreign support order at issue was filed with the court, the respondent "received notice of registration and had ample opportunity to answer." 126 Wash.App. 487, 108 P.3d 824, 829 (2005). The court emphasized that respondent "suffered no prejudice from the error," and reasoned that accepting the filing as sufficient registration "furthers the statutory policy":

> Public policy supports our determination that substantial compliance is the appropriate standard where there is no prejudice to the obligor. UIFSA encourages parties to register valid child support orders, and the procedural safeguards are designed to minimize the risk of prejudice to the obligor. UIFSA does

not support a policy that punishes support recipients for minor, harmless procedural errors in registration. [The respondent] does not dispute the validity of the Kansas order or that he owes back support. Holding that the registration was invalid under these circumstances would undercut UIFSA's purpose.

*Id.*

A Mississippi court has similarly concluded that a father's filing of a foreign divorce decree at the onset of a child-custody proceeding satisfied the UIFSA registration requirement for the mother's requested modification of that order's support provisions in the same litigation. *Nelson v. Halley,* 827 So.2d 42, 45–46 (Miss.Ct.App.2002) (en banc). In that case, the father filed suit in Mississippi attaching a California divorce decree and seeking primarily to modify its custody terms to award him custody of one of the parties' children.[6] *Id.* at 44. The respondent counter-petitioned, requesting modification of the California divorce degree to increase the obligor's support obligation as to the parties' other children. *Id.* That request was granted and the obligor appealed, arguing that the court lacked subject-matter jurisdiction to modify the California support order in part because the mother did not properly register the order under the UIFSA. *Id.* at 44–45. The court of appeals rejected this argument, noting that—as in this case—the "foreign judgment and most of [the required information] was filed not by the mother who was seeking a modification, but by the

---

**5.** David cites several other cases from other jurisdiction as "concluding that foreign child support orders must first be registered before another state obtains the subject-matter jurisdiction to modify or enforce the order," but we disagree that these cases hold failure to

comply with registration procedure implicates subject-matter jurisdiction.

**6.** In conjunction with that request, he also asked the court to terminate his obligation to pay child support for that child if he was awarded custody. *Nelson,* 827 So.2d at 44.

father when he began his suit seeking modification of custody." *Id.* at 45. While some statutorily required information was missing, the foreign judgment "had adequately been filed," and was "of record in Mississippi in the proper clerk's office, regardless of who filed it." *Id.* at 46.[7]

Generally, under Texas law, failure to establish a statutory procedural prerequisite does not deprive the trial court of subject-matter jurisdiction over a plaintiff's claim if the statutory prerequisite is merely a condition on which the plaintiff's right to relief depends. *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75–77 (Tex. 2000). "A statutory requirement is jurisdictional, as opposed to substantive, only when the Legislature's intent so indicates." *City of Seabrook v. Port of Houston Auth.*, 199 S.W.3d 403, 409 (Tex.App.-Houston [1st Dist.] 2006, pet. dism'd) (en banc).

Like other states, we agree with Kim that the specific procedural registration requirements enumerated in the UIFSA's enforcement provisions codified at section 159.602 of the Texas Family Code are not jurisdictional here, where the parties had actual notice of the proceedings, expressly invoked the jurisdiction of the Texas court, and stipulated in the initial New York Judgment that further proceedings would take place in Texas. While no Texas case has squarely addressed this issue under the UIFSA, our conclusion is consistent with this Court's interpretation of similar foreign child support registration procedures under the UIFSA's predecessor, the

Revised Uniform Reciprocal Enforcement of Support Act ("RURESA"). *See Longhurst v. Clark*, No. 01–07–00226–CV, 2008 WL 3876175, at *3–4 (Tex.App.-Houston [1st Dist.] Aug. 21, 2008, no pet.) (mem. op.). In *Longhurst* a child-support obligor challenged the validity of a Texas child-support order by collaterally attacking the earlier Texas order in which the court first assumed jurisdiction to enforce and modify a Colorado support order on the grounds that the Colorado order was never properly registered under RURESA. *Id.* The applicable version of RURESA required three certified copies of the foreign order be transmitted to the prosecuting attorney at the Attorney General's office, who in turn was required to transmit them to the clerk of the court for filing in the court's registry of foreign support orders. *Id.* at *3. Much like David argues here, the obligor in *Longhurst* contended that "because the procedural requirements for registration are mandatory, the Colorado order's absence prevented the trial court from having subject matter jurisdiction to enter any judgment based on the order." *Id.* at *4. This Court disagreed, explaining that "[r]egistration of a foreign support order is simply a statutory prerequisite to enforcement of the order in Texas." *Id.* We reasoned that a "court's action contrary to a statute" means the action is erroneous or voidable, but not void, so jurisdiction is not implicated. *Id.* That reasoning applies with equal force to UIFSA's registration procedures in section

---

**7.** Other jurisdictions have likewise declined to view the UIFSA's registration requirements as jurisdictional. *E.g., Summers v. Ryan*, No. E2006–01757–COA–R10–JV, 2007 WL 161037, at *3 (Tenn.Ct.App. Jan. 23, 2007) ("[T]he alleged shortcomings of Ms. Summers' petition to register a foreign judgment under the UCCJEA or UIFSA do not deprive the Rhea County Family Court of subject matter jurisdiction, but rather result in the for-

eign judgment being unregistered and unenforceable until the technical filing deficiencies are cured."); *State v. Hill*, No. A05–781, 2006 WL 1229137, at *5 (Minn.Ct.App. May 4, 2006) (holding trial court erred by modifying foreign support order without requiring petitioner to register it pursuant to the UIFSA, but "that father waived any objection to this procedural defect by not raising it").

159.602. We thus likewise conclude that they are not jurisdictional.

### 2. Consent

■ Because Kim—the party seeking modification of a support order—resides in Texas, the parties agree that both parties' consent is a necessary prerequisite to a Texas court's acquiring jurisdiction to modify, rather than simply enforce, the support obligations in the New York judgment. Under Texas's version of the UIFSA effective when the trial court entered both the 2005 Order and the 2009 Reformed Final Order, the parties must have "filed in a record in the issuing tribunal consents for a tribunal of this state to modify the support order and assume continuing, exclusive jurisdiction." TEX. FAM. CODE ANN. § 159.611(a)(2) (Vernon 2008). The version in effect when the trial court entered the 1999 Order differed in that it required "written consents" be filed in the issuing state. *Id.* § 159.611(a)(2) (Vernon 1997). The parties disagree about whether they effectively consented to Texas's jurisdiction under section 159.611.

The few cases from other jurisdictions considering the adequacy of consents under the UIFSA indicate there is no particular form in which such consent must be made so long as it clearly reflects the parties' intent to consent to transferring exclusive and continuing jurisdiction in the new forum. A California court, in *Knabe v. Brister,* deemed a stipulation entered into by the parties' attorneys and filed in both California and Texas agreeing that "California courts shall have jurisdiction over this matter for all purposes including, but not limited to jurisdiction to modify the [Texas Court order], and to make such orders as the court deems appropriate concerning custody, visitation and support" to be effective, despite one party's later argument that his attorney lacked permission

to stipulate to California jurisdiction over support issues. 154 Cal.App.4th 1316, 65 Cal.Rptr.3d 493, 496–97 (2007). In addition to rejecting the argument that a party's attorney may not effectively consent on behalf of that party, the court noted that complaining party's acquiescence in the California court's jurisdiction in custody matters ratified the attorney's stipulation consenting to the transfer of both custody and support matters to the California court. *Id.* at 500.

In *Nelson v. Halley,* a Mississippi court found jurisdictional recitations in agreed temporary orders filed in Mississippi to be effective as consents to confer jurisdiction on the Mississippi court to modify a California support order, but remanded to the court for satisfaction of the requirement that consents be filed with the California Court. 827 So.2d at 50. In finding effective consent, the court focused on the expectation of the parties and the purposes sought to be advanced to the consent requirement. The court ultimately concluded that the court's deeming the consents as effective despite their filing in the appropriate jurisdiction coming late in the procedure did not run counter to any of the interests behind the consent requirement. *Id.*

The record here, taken as a whole, reflects the parties' intent that the Texas courts have exclusive and continuing jurisdiction over all matters related to the parties' divorce except for equitable distribution of the property. Kim's attorney, while reciting the parties' stipulation related to visitation and custody on the record in New York, stated that the "Court will refer any future matters concerning visitation and custody to Texas court or any court within the Uniform Custody Jurisdiction Act which might be the home state of the children in the future." David's lawyer, during the same portion of the

hearing, stated David was "asking the Court to refer all future matters to whatever appropriate jurisdiction." Later in the hearing, however, when the court was discussing all the agreed terms to be incorporated into a final decree, he specifically asked whether the judgment should "have a full reference of all future matters both with regard to the matrimonial—matrimonial issue and custody issue, to the Texas court," to which David's lawyer responded "Yes, Your Honor." The parties and their attorneys entered a written "Adoption of Oral Stipulation" agreeing that "issues in this matrimonial action were disposed of by a Stipulation and placed on the record in open court," confirming their complete understanding of the agreement, and consenting to their terms in the court's judgment of divorce. The resulting New York Judgment stated that "except for issues regarding equitable distribution, all future questions concerning *child support, maintenance, enforcement, interpretation or modification* of this Judgment of Divorce shall be referred to the appropriate Court in the State of Texas where the Defendant and the children of the parties reside, or any other appropriate Court having jurisdiction." (emphasis added). Neither party took an appeal from the New York Judgment, and there is no indication in the record that David ever complained that the New York Judgment's referring future support modification issues to Texas or any other appropriate jurisdiction was inconsistent with the parties' agreement that the judgment purported to memorialize.

The parties' conduct in the underlying suit bolsters our conclusion that understood their consent to transfer of jurisdiction to the Texas courts to encompass both enforcement and modification of support obligations. In David's first pleading in the Texas court, he stated "as set out in the terms of that Judgment for Divorce, all future proceedings incident to this divorce

and custody matter are to be heard in Harris County, Texas." And he has never in a filing sought to distinguish between the Texas court's jurisdiction over custody matters on the one hand and support matters on the other. For these reasons, we hold the parties effectively consented to the Texas court's exercise of jurisdiction to modify the New York Judgment's support provisions.

Having concluded, as threshold matters, that—under these facts—UIFSA's registration procedures are not jurisdictional and that the parties effectively consented to the Texas court's exercise of jurisdiction over support matters, we turn to David's specific jurisdictional arguments.

### 3. Are the 1999 and 2005 Orders void?

Citing *Moore v. Moore*, No. 05–00–01766–CV, 2001 WL 1390921 (Tex.App.-Dallas Nov. 9, 2001, no pet.) (not designated for publication) as "directly on point," David argues that this Court must "analyze whether the trial court had subject-matter jurisdiction when it rendered the 1999 and 2005 orders and whether the 1999 and 2005 orders served to establish the trial court's jurisdiction to enter the 2009 Reformed Order." In *Moore*, the parties' 1991 Florida divorce decree was the subject of a later motion to modify child support filed in Texas by the mother, a Texas resident. 2001 WL 1390921, at *1. In 1995, the Texas court signed an agreed order increasing the father's monthly child support obligation. *Id.* In 1999, the mother filed a motion to modify the 1995 order, and the father moved to "dismiss the petition to modify for lack of jurisdiction asserting the 1995 agreed order was void and Florida still had continuing and exclusive jurisdiction over the matter." *Id.* The trial court granted the motion to dismiss, and the court of appeals affirmed. *Id.*

The mother argued on appeal that Texas "obtained exclusive jurisdiction when the trial court signed the 1995 agreed order modifying the Florida support order." *Id.* In response, the father contended "the 1995 agreed order is void because the statutory requirements necessary for Texas to assume jurisdiction were never satisfied." *Id.* The Dallas court agreed, noting that "it is undisputed that mother did not register the Florida support order in Texas as required by the UIFSA," and "there is nothing in the record to indicate that mother and father filed with the Florida court written consent permitting Texas to exercise exclusive jurisdiction over the Florida order." *Id.* at *2. The court went on to explain,

> Failure to satisfy these statutory prerequisites precluded Texas from obtaining jurisdiction to modify the Florida order. Because the 1995 agreed order modifying the Florida child support obligation was entered without subject matter jurisdiction, the order is void. This void order can therefore provide no basis for the trial court to decide mother's 1999 motion to modify.

*Id.* (citations omitted). Acknowledging the mother's argument that her "failure to register the Florida order was nothing more than a procedural complaint that father waived by failing to raise it in the 1994 modification proceeding," the court declined to treat the failure to register as dispositive, opting instead to rest its decision on the lack of consent. *Id.* at *3.

> Even assuming that mother is correct in her assertion that registration of the foreign order is not a jurisdictional requirement, it is undisputed that mother was a resident of Texas at the time she filed her petition to modify the Florida order. Texas therefore had no authority to act on mother's petition. . . .

> Our conclusion that the trial court lacked subject matter jurisdiction to modify the Florida support order because mother was a resident of Texas makes it unnecessary to address mother's remaining points of error. The 1995 agreed order upon which mother relies exclusively to establish the trial court's jurisdiction is void.

*Id.*

Neither *Moore's* reasoning nor its result compels us to conclude that the 1999 and 2005 Orders are void. Here, as the father did in *Moore,* David asks us to invalidate prior final judgments, i.e. the 1995 and 2005 Orders, from which he did not take a direct appeal. There are specific limitations on a court's ability to void a previous order that is collaterally attacked.

 A collateral attack, unlike a direct appeal, is "an attempt to avoid the effect of a judgment in a proceeding brought for some other purpose." *Armentor v. Kern,* 178 S.W.3d 147, 149 (Tex.App.-Houston [1st Dist.] 2005, no pet.) A party may only collaterally attack a judgment as void. *Id.* A "judgment is void only if the court had no jurisdiction over the parties or the property, no jurisdiction over the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act as a court." *Id.* All errors other than jurisdictional deficiencies render the judgment voidable, which may only be corrected on direct appeal. *Id.* "The party collaterally attacking the judgment bears the burden of demonstrating the judgment under attack is void." *Id.*

 "When reviewing a collateral attack, we presume the validity of the judgment under attack." *Toles v. Toles,* 113 S.W.3d 899, 914 (Tex.App.-Dallas 2003, no pet.). "We limit our review to determining whether the record affirmatively and conclusively negates the existence of jurisdic-

tion, not whether the court otherwise erred in rendering its judgment." *In re K.M.P.*, 323 S.W.3d 601, 603 (Tex.App.-Austin, 2010, pet. filed). "While we indulge every reasonable presumption in favor of the judgment's validity, we may consider only the face of the record and may not presume that something omitted from the clerk's record might have supported jurisdiction when faced with a record that otherwise negates jurisdiction." *Id.* at 603.

■ Because we have held that failure to strictly comply with section 159.602's registration procedures does not deprive the Texas courts of subject-matter jurisdiction over a foreign support order, David waived any complaint about Kim's failure to comply with section 159.602's requirements by failing to take a direct appeal from the 1999 Order. *See, e.g., Longhurst*, 2008 WL 3876175, at *4 (complaint about failure to properly register a foreign support order—a statutory prerequisite to obtaining an enforcement order—could only render enforcement order voidable, not void, so it was not subject to collateral attack); *In re Ocegueda*, 304 S.W.3d 576, 580 (Tex.App.-El Paso 2010, pet. denied) (complaint about procedural irregularities in obtaining expunction order could only render earlier judgment voidable, not void, so it was not subject to collateral attack).

The 1999 Order does not, on its face, contain any jurisdictional recitations. And it is undisputed that Kim resided in Texas, and David lived in Mexico City, when the 1999 Order was entered. Because the general rule is that the petitioner in a modification proceeding must be a nonresident of Texas before the court can exercise jurisdiction to modify a support order, Tex. Fam.Code Ann. 159.611(a)(2), if the 1999 Order modifies, rather than simply clarifies and enforces the New York Judgment, it is subject to being voided by collateral attack unless the record demonstrates that an alternative basis for jurisdiction applies. *Cf. Huffstutlar v. Koons*, 789 S.W.2d 707, 710 (Tex.App.-Dallas 1990, no writ) (prior custody determination could be voided in collateral proceedings where the trial court's basis for determining child's "home state" was invalid and resulted in order erroneously designating Texas as home state as basis for Texas state court jurisdiction); *Alfonso v. Skadden*, 251 S.W.3d 52, 55 (Tex.2008) (where record affirmatively reveals jurisdictional defect, court cannot assume alternative basis for jurisdiction exists by indulging presumption that "something omitted from the clerk's record might have supported jurisdiction").

■ The pleadings in the 1998/1999 proceedings leading to entry of the 1999 Order attach a copy of the New York Judgment, which attached and incorporated the transcript of the hearing at which the stipulations were recited, as well as the parties' written "Adoption of Oral Stipulation." Because we have already concluded that these, in combination, met the 1995 jurisdictional requirement that the parties file "written consents" in New York for Texas to modify the New York Order and assume continuing, exclusive jurisdiction over the order, Tex. Fam.Code. Ann. § 159.611(a) (Vernon 1997), David cannot demonstrate that the trial court lacked jurisdiction to enter the 1999 Order. This distinguishes this case from the facts presented in *Moore*, where there was no evidence of consent. Accordingly, David has not shown the 1999 Order to be void and it thus cannot be collaterally attacked.

Unlike the 1999 order, the 2005 Order does contain jurisdictional recitations that the court, "after examining the record and the evidence and argument of counsel, finds it has jurisdiction of the case and of all the parties and that no other court has continuing, exclusive jurisdiction of this

case." And, in 2005 section 159.611 had been amended such that jurisdiction could be established by demonstrating consent was "filed in a record" in New York, without the earlier requirement that such consent be "written." TEX. FAM.CODE. ANN. § 159.611(a) (Vernon 2005). The subject-matter jurisdictional recitals in the 2005 Order afford that judgment a strong presumption of validity, which can only be overcome by record evidence affirmatively revealing a jurisdictional defect. *Alfonso*, 251 S.W.3d at 55.

David's arguments for voiding the 2005 Order are identical to those he lodges in collaterally attacking the 1999 Order, i.e., he argues that lack of registration and consent void the 2005 Order. Our analysis of the registration and consent issue apply with equal force to the 2005 Order and would sustain independent jurisdiction to modify the support provisions of the New York judgment irrespective of whether the 1999 Order effectuated a substantive modification sufficient to confer continuing, exclusive jurisdiction over future modification proceedings. *See* TEX. FAM.CODE ANN. § 159.611(d) ("On issuance of an order by a tribunal of this state modifying a child support order issued in another state, the tribunal of this state becomes the tribunal of continuing, exclusive jurisdiction."). David's collateral attack of the 2005 Order fails as well. For these reasons, we hold that David has failed to establish that the 1999 or 2005 Orders are void.

### 4. Is the 2009 Reformed Final Order void?

The parties disagree about whether the 1999 and 2005 Orders substantively modified the New York Judgment or rather merely clarified and enforced it. Kim claims that the "1999 Order adopted certain terms of the New York Judgment (i.e., amount of child support); clarified others (i.e. providing for conservatorship and parental rights under the Texas statutory scheme) and substantively modified the New York child support order by providing that payments would be made through the Harris County child support registry and further by ordering wage withholding." She characterizes the trial court's 2005 Order "providing for the specifics of David's obligation to provide health insurance" as a "child support modification order" as well. David asserts that the 1999 and 2005 Orders only clarified and enforced, rather than modified, the New York Judgment. Nonetheless, he argues that "regardless of whether the 1999 and 2005 orders were (1) void orders purporting to modify the substance of the New York child support orders or (2) clarification orders not affecting the validity of the New York support order, thus causing the New York Judgment to stand as the lone child support order at the outset of the 2008–2009 litigation, it is clear that neither could provide a basis for the trial court's assertion of subject-matter jurisdiction to enter the 2009 Reformed Order."

We need not decide here whether the trial court's 1999 and 2005 Orders modify, rather than merely enforce and/or clarify, the scope of the New York Judgment. It is undisputed that the 2009 Reformed Judgment that is the subject of this direct appeal is a modification order and it is undisputed that, at the time that order was entered, Kim resided in Texas and David did not. As such, the court could only modify David's support obligations under either (1) section 159.611(a)(2) (requiring foreign order be registered and parties to have filed consents in New York) or (2) section 159.611(d) (conferring continuing, exclusive jurisdiction to modify support terms if the court has entered a prior support modification order). *See* TEX. FAM. CODE ANN. § 159.611.

Regardless of whether the 1999 or 2005 Orders modified, or just enforced, David's support obligations under the New York Judgment, that foreign judgment has been effectively "registered" since 1999 when judgment was entered enforcing or modifying the New York Judgment with no objection from David that the New York Judgment was not registered. Thus, the procedural registration prerequisite to the 2009 Reformed Final Order as a stand-alone support modification order has been met.[8] Because we have also already held the parties effectively "consented" in New York, the issuing state, to the transfer of jurisdiction over support matters, the trial court had jurisdiction to enter the 2009 Reformed Judgment irrespective of whether the prior two orders had conferred upon it continuing, exclusive jurisdiction to modify the New York Judgment. And because the trial court had jurisdiction to enter the 2009 Reformed Final Order at issue in this appeal, it is now the court of "continuing, exclusive jurisdiction" over support matters. Tex. Fam.Code Ann. § 159.611(d).

### III. The terms of the 2009 Reformed Final Order enforcing and modifying David's support obligations.

David characterizes the trial court's ordering him to deposit additional funds into HK's College Trust as modification, rather than enforcement, of his existing support obligations. He then challenges—as exceeding the proven needs of the children—the trial court's (1) award of the additional money for HK's College Trust, (2) continu-

ing his $2,000 monthly support obligation, with a step-down to $1,600 when DK turns 18, and (3) ordering David to pay DK and HK's private high school tuition. He further complains of the court's including "lump sum child support payments with a showing of good cause," "failing to make the findings required by Texas Family Code [§ ] 154.130," and erroneously "calculating Appellant's net monthly resources" by not distinguishing between corpus and income from his trusts.

Kim characterizes the trial court's ordering David to deposit additional finds into HK's College Trust as proper enforcement, rather than modification, because "David has an enforceable obligation to insure that the represented funds for [HK]'s support and education past the age of 18 are secure and available." After removing these enforcement amounts from consideration, she argues that the trial court's modifications related to David's support payments and private school tuition "are reasonable in light of the needs of the children and the parties' ability and willingness to pay." Finally, she contends that any failure by the trial court to make required findings and its inclusion of trust principal in finding David's net worth were harmless and, as such, should not lead to reversal.

#### A. Applicable law

"A registered order issued in another state is enforceable in the same manner and is subject to the same procedures as

---

8. Throughout most of David's brief, he argues that failure to properly register a foreign support order deprives the court of subject-matter jurisdiction under the UIFSA. His brief also includes the statement that the "trial court's action in modifying and enforcing an *unregistered* New York child support order without reference to the registration mandates of UIFSA is a clear abuse of discretion," followed by the request that this Court "order

the trial court to vacate the Reformed Order ... pending compliance with the UIFSA registration statutes." For reasons previously discussed, this registration complaint—while a proper subject for direct appeal—is untimely. That complaint could only have been brought on direct appeal from the court's 1999 Order enforcing and/or modifying the New York Judgment.

an order issued by a tribunal of this state." TEX. FAM.CODE ANN. § 159.603(b). "Modification of a registered child support order is subject to the same requirements, procedures, and defenses that apply to the modification of an order issued by a tribunal of this state, and the order may be enforced and satisfied in the same manner." *Id.* § 159.611(b). "[T]he court may modify an order that provides for the support of a child ... if the circumstances of the child or a person affected by the order have materially and substantially changed since ... the date of the order's rendition." *Id.* § 156.401(a)(1)(A).

## B. Standard of Review

A trial court has broad discretion in ruling on child support matters and will not be reversed absent a clear abuse of discretion. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990). The test is whether the trial court acted arbitrarily, unreasonably, or without reference to guiding rules and principles. *Id.* "[W]e review the evidence in the light most favorable to the order and indulge every presumption in favor of the trial court's order." *McLane v. McLane,* 263 S.W.3d 358, 362 (Tex.App.-Houston [1st Dist.] 2008, no pet.). "If some probative and substantive evidence supports the order, there is no abuse of discretion." *Id.* In contrast with the court's broad discretion in ordering and modifying support orders, the court has no discretion to forgive proven child support arrearages. TEX. FAM. CODE ANN. § 157.263 (Vernon 2008); *In re J.I.M.,* 281 S.W.3d 504, 508 (Tex.App.-El Paso 2008, pet. denied).

"In an appeal of a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict." *Brejon v. Johnson,* 314 S.W.3d 26, 30 (Tex.App.-Houston [1st Dist.] 2009, no pet.). If findings are challenged, they are not determinative unless supported by the record. *Id.* We review the sufficiency of the evidence supporting the challenged findings to determine whether the trial court abused its discretion in making such findings. *Id.*

## C. HK's College Trust—Enforcement or Modification?

David argues that the "New York Judgment does not contain any stipulation, order, or agreement obligating David to pay for the children's college education." Nor does the New York Judgment, he asserts, "provide any provision or order requiring David to deposit funds into any trust for the purpose of payment of college tuition expenses." Thus, he contends, the court "creates a new child support obligation" by "requiring David to deposit a lump sum of approximately $150,000 into the [HK] 1996 Trust more than five years before she will graduate from high school."

Kim disagrees, asserting that "David already had an existing enforceable obligation related to the payment of [HK]'s support and education after she reached the age of 18 under the New York judgment" that "David has not fully satisfied." She notes that, in the parties' stipulations, "David represented the *present* existence of specific resources to pay for not only each child's college education, but their overall support after they reached the age of eighteen (18)." Thus, she contends, the "trial court's order obligating David to fully fund [HK]'s trust was not a new child support obligation but instead the enforcement of an existing one."

In a section of the 2009 Reformed Final Order entitled "Order on Enforcement Regarding College Education Expense," the court quotes the New York Judgment order that "all future questions concerning child support, maintenance, enforcement, interpretation or modification of this Judg-

ment of Divorce shall be referred to the appropriate court in the State of Texas where the Defendant and the children of the parties reside, or any appropriate court having jurisdiction," and concludes "[t]his Court finds that it is the appropriate Court to enforce the New York Judgment of Divorce."

The court then recites the following portions of the parties' stipulations:

> The parties recognize the need for a college education for the children. And husband in particular represents to his wife, to me and to the Court that there is a collateral source existing for that payment: it is in the sum of at least $250,000 at the present time, pursuant to a trust instrument that is administered now out of Boston in which Mr. Battinelli is familiar. That he further represents that there is enough funding in that trust to pay for an undergraduate education in behalf of the children.
>
> . . . .
>
> With regard to the child support . . . will continue until the age of 18 for the oldest child. At which time the, what was referred to by Mr. Woronov as the college trust—there are actually two separate trusts, one for each of the children: [HK] and [DK]. And those are actually well-being trust[s]. They include more than just college education. So that at the time the oldest child is 18, Mr. Kendall will stop making direct payments for child support for that child to Mrs. Kendall and the trust provisions will kick in and take over, the entire support as well as the cost of college education. And I will also point out that there is no limit in time contained in those trust instruments so that there is no date or age by which a child must complete college.

Finally, the court noted that David agreed he would "abide by those terms" if

incorporated into a divorce decree. Stating that "the representations of David F. Kendall as to [HK] were not true," and that "David F. Kendall has failed to comply with and abide by the provisions of the New York Judgment of Divorce," the order further provides:

> David Kendall is therefore ORDERED to transfer funds or asserts into the [HK] 1996 Trust, as additional child support, in an amount sufficient to bring the aggregate value of that trust corpus to the amount of $250,000 . . . IT IS ORDERED that this obligation shall be in the nature of child support.

The court's Findings of Fact and Conclusions of Law from Reformed Order dated October 29, 2009 ("Findings of Fact") additionally provide:

31. [A]t the time of the trial in this cause, the aggregate amount of the [UK] 1996 Trust was approximately $97,000. The Court further finds that David F. Kendall testified that the current balance of the [UK] 1996 Trust would not be sufficient to pay for four years of college.

32. The Court finds that Kim M. Kendall relied upon the representations by David F. Kendall and his representative or agents . . . at the time of divorce that trust funds were in existence to pay for the children's college education expenses as well as all expenses for the children's support during their college years. Based upon this representation, Kim M. Kendall agreed that David F. Kendall's periodic child support obligation to her would cease when each child turned 18 years old and graduated high school rather than continue until each child turned 21 years, in accordance with New York law.

33. The Court finds that Kim M. Kendall has not routinely received statements for the [DK] 1994 Trust or the [HK] 1996 Trusts. The Court further finds David F. Kendall did not provide Kim M. Kendall copies of the trust instruments until he was compelled by this Court and sanctioned in January 2009. The Court finds that David F. Kendall was previously ordered to provide the trust instruments by this Court in 1999.

34. The Court further finds that no trust or trust provisions exist which *require* the trustees to disburse funds to pay for either child's college education. The Court further finds that no trusts or trust provisions exist which *require* the trustees to disburse funds to pay for either child's living expenses during their college years. The trustees for the [DK] 1994 Trust and the [UK] 1996 Trust have absolute discretion to accumulate or disburse trust funds.

35. The Court finds that the terms of the [DK] 1994 Trust do not permit trust funds to be extended for the benefit of [HK] or any person other than [DK] during [DK]'s lifetime.

36. The Court finds that no contributions have been made to either the [DK] 1994 Trust or the [HK] 1996 Trust since the parties' divorce in 1998.

37. The Court finds that Kim M. Kendall received fewer assets in the divorce in exchange for David F. Kendall's commitment to take care of the children's college education expenses.

38. The court finds that at trial, David F. Kendall acknowledged that he intended to make future contributions to [HK]'s trust when this litigation with Kim M. Kendall concluded, and that with existing trust asserts as well as the use of his own funds, the children's college expenses would be paid.

39. The court finds that by representing in 1998 that sufficient funds existed in trusts to pay for the college education and support of both children after the age of 18 years, David avoided an obligation to pay child support for the children through the age of 21 under New York law.

40. The court finds that some of the funds held in the children's trusts at the time of the parties' 1998 divorce were contributed by David F. Kendall and Kim M. Kendall during their marriage.

David does not challenge any of the Court's findings specifically, but generally argues that (1) the court's conclusion that David represented in the New York proceedings that *each* child's trust contained $250,000 is wrong, and (2) the court's "unilateral[ ] determin[ation]" that the approximately 97,000 in the [HK] Kendall 1996 Trust was insufficient to pay for [HK]'s undergraduate education" was "speculative at best" because its veracity depends on market conditions, future deposits, and the college at which HK might enroll.

We disagree with David on both counts. The stipulations referred to funds currently existing at the time of the parties' 1998 divorce, not funds that might be available in the future. And Kim's attorney expressed Kim's understanding to the New York court—while discussing the parties' agreement as to "the need for a college education for *the children* "—David's representation that "there is a collateral source existing that payment; it is in the sum of *at least $250,000 at the present*

*time* .... he further represents that there is enough funding in that trust to pay for an undergraduate education in behalf of *the children* ...." David's own attorney clarified later in the hearing that support payments for both children cease when the children turn 18, and that "the trust provisions will kick in and take over, the entire support as well as the cost of college education." These representations were expressly incorporated by the New York court as part of the New York Judgment.

Although David does not expressly offer an alternative interpretation to the court's finding that he represented that *each* trust had a balance of at least $250,000, implicit in his argument is the assumption that the stipulations only provide that the children's trusts, in total, contained at least $250,000. The problem with that interpretation is that the stipulations further provide that the sums in each trust will cover "the entire support as well as the cost of a college education." The court did not, as David asserts, "unilaterally determine[ ]" that the funds in HK's trust were insufficient to pay for HK's undergraduate education. David himself testified as much. When the question was posed: "So—the statement—the statement that there was enough funding in those trusts to pay for college education could not have been true for [HK], correct?," David responded "At the time, no." And he further agreed that "as we sit here today, with 97 something thousand dollars in that trust, that is not sufficient to pay all of her college and living expenses beyond the age of 18." David does not dispute that DK's trust cannot be used to benefit HK. Nor does David challenge the court's finding that, in reliance on his representation that trust funds were in existence to pay for the children's college and living expenses— Kim agreed his child support obligation would cease when the children reached 18 instead of 21, and that she received fewer

assets in the divorce in exchange for his commitment.

We find the trial court's concluding "that David F. Kendall undertook a legal obligation to insure that at least $250,000 in funds were available in the HK Trust to fund her college education" was supported by the evidence. Once the court determined that representation was not true, it was empowered to order a lump sum payment to enforce that David's obligation under the New York Judgment. Tex. Fam. Code Ann. § 159.305(b)(2) (court may enforce foreign support order by ordering "obligor to comply ... and specify the amount and the manner of compliance"); *see also id.* § 157.263 (authorizing the court to render a cumulative money judgment for support arrearages, including "lump sum[s]"). Because we conclude the court's ordering David to deposit funds into HK's College Trust was an enforcement of the New York Judgment, we reject David's contention that it amounted to an improper modification of his support obligations.

**D. Are the trial court's support modifications within its discretion?**

David argues that the trial court's modification of his support obligation "exceeds the proven needs of the children." He specifically identifies three support payment obligations imposed on him by the 2009 Reformed Final Order: (1) $2,000 per month until DK is emancipated, at which time the payment drops to $1,600; (2) 100% of the tuition and fees of both children's private high school tuition, in a lump sum payment in advance of each school year; and (3) approximately $150,000 lump sum payment into HK's College Trust. We have already concluded that the payment to HK's trust is not a new support obligation, but rather the enforcement of the New York Judgment.

We thus only address David's arguments directed at the monthly support payments and the high school tuition here.

When an obligor's net resources exceed $7,500 per month, the court is to apply the presumptive percentage guidelines to the first $7,500 in net resources. TEX. FAM. CODE ANN. § 154.126(a) (Vernon 2010). The presumptive percentage guideline applied to the net resources of an obligor with two children before the court is 25% of the obligor's net resources. *Id.* § 154.125, § 154.126. The trial court "may order additional amounts of child support as appropriate, depending on the income of the parties and the proven needs of the child[ren]." *Id.* § 154.126(a). If the court orders more than the presumptive award, section 154.126(b) requires that the court first determine the proven needs of the children. If the needs of the children exceed the presumptive amount, the court subtracts the presumptive amount from those needs and then allocates between the parties the responsibility to meet those needs, according to the parties' circumstances. *Id.* § 154.126(b). The obligor may not be ordered to pay more child support than the greater of the presumptive amount or 100% of the children's proven needs. *Id.*

The trial court found Kim's monthly net available resources to be $5,952. It found David's monthly net resources include "both earned income and substantial resources in the form of trust assets." In its Findings of Fact, the court outlines the various trusts of which David is a beneficiary, and notes that the full amount of his distributions are not reported on his income tax return based on IRS reporting rules for trust distributions. The court then concluded that "the net resources available to David F. Kendall exceed $20,000 per month."

The court recognized that the presumptive guideline amount of support—applied to David's first $7,500 of David's net resources—is $1,875 per month. It then listed the following as "reasons the amount of periodic support per month ordered by the Court varies from the amount computed by applying the percentage guidelines":

a. David F. Kendall has paid $2,000 in monthly periodic child support since he agreed and stipulated to that child support amount in July, 1998 and said stipulation was approved as the Judgment of Divorce. . . .

b. Neither party pled for or otherwise requested a decrease in the $2,000 periodic monthly payments.

c. After [DK] reaches majority, then David F. Kendall's support payments should "step down" or reduce by 5% to $1,600 per month in accordance with the Texas Family Code.

d. The proven needs of the children warrant additional periodic monthly child support.

e. The expenses pertaining to the children have increased since 1998 when the monthly periodic child support was initially ordered.

The court made additional specific Findings of Fact in support of its order that David "should be ordered to pay, in addition to periodic monthly child support, tuition and fees for both children to attend private high school:"

a. The parties agreed and stipulated [in their divorce] that the children should attend private school. Funds were set aside to pay private school tuition and educational expenses at the time of divorce. These funds . . . have been depleted to pay for the children's elementary and middle school costs since 1998.

b. At the time of trial, the parties stipulated that the children should re-

main in private school through high school graduation. Further, the Court finds that both parties agreed that the public school options available to the children are not desirable or satisfactory to either parent.

c. Both parties have approved [DK]'s choice [of private high school].

d. The Court finds it was not possible for Kim M. Kendall to save sufficient funds from periodic child support payments received each month to pay for the children's private school after the trust funds were depleted. The Court further finds that Kim M. Kendall cannot afford to pay 100% of private high school tuition and expenses for either child.

David does not challenge any of these findings.

### 1. Additional support payments for HK upon DK's emancipation

█ David does not lodge any complaint specifically directed at the court's continuation of his obligation to pay $2,000 per month or the court's stepping down the support to $1,600 when DK turns 18. Rather, he notes that the $2,000 exceeds the relevant presumptive guidelines amount and argues generally that the trial court has awarded an amount that exceeds the proven needs of the children.

David's $2,000 monthly support payment exceeds by $125 per month the presumptive amount for 2 children, i.e., $1,875, derived by applying the guidelines to the first $7,500 of his net monthly resources. David did not, however, request that amount be lowered to $1,875, and the trial court's continuing this previously ordered, agreed-upon amount, was not a modification of his existing support obligation.

█ The court's order providing a step-down in support payments from $2,000 to $1,600 does represent a modifica-

tion of David's support obligation. Under the New York Judgment, David is obligated to pay $1,000 per month per child until the child reaches the age of 18. Thus, under that agreement, when DK turns 18, David support obligation would change from $2,000 to $1,000.

The trial court was presented with detailed evidence about the children's expenses and their extracurricular activities, as well as direct testimony about how their expenses have increased since the New York Judgment was entered. *E.g., Brejon*, 314 S.W.3d at 29 (recognizing uncontroverted testimony as to increased living expenses as supporting modification). The court's modifying David's support obligation to provide a step-down to $1,600 when DK turns 18 was supported by the court's finding of a material and substantial change in circumstances. TEX. FAM. CODE ANN. § 156.401(a)(1)(A). The modified amount providing a step down by 5% was in accordance with the step-down provided by the guidelines. *E.g.*, TEX. FAM. CODE ANN. 156.402 ("[T]he court may modify the order to substantially conform with the guidelines if the modification is in the best interest of the child."). The trial court did not abuse its discretion.

### 2. Private-school tuition

█ In complaining of the trial court's order that he pay 100% of the children's private high school tuition, David does not challenge the trial court's finding that the DK's and HK's private-school tuition is a proven need. Instead, he complains that (1) the award is too uncertain because HK has not yet identified a school, and (2) the court did not have "good cause" to order lump sum tuition payments at the beginning of the school year.

At the time of trial, DK had been accepted into his private high school of

choice. An information sheet and tuition schedule for that school was entered into evidence indicating that annual tuition for the 2009–2010 school year is $13,600 (payable in either one or two payments). HK had not yet applied or been accepted to any particular private high school, but Kim testified about three high schools she planned to apply for admission for the 2010–2011 school year. An information sheet about those three schools, as well as a sampling of other available Houston private high schools, was entered into evidence. These exhibits reflected the tuition of HK's two favored schools as $16,515 (payable in one, two, or nine payments) and $10,950 (payable in one or two payments). Kim's expense projections estimated HK's high-school tuition would average $13,000 per year.

David complains that, "[w]ithout knowledge of the amount of the tuition that will be required to be paid or the school to which the tuition was to be paid, the trial court ordered David to pay 100% of [HK]'s high school tuition and fees." *See In re Grossnickle,* 115 S.W.3d 238, 249 (Tex. App.-Texarkana 2003, orig. proceeding) (order providing father to pay 1/2 tuition too vague to be enforced). This prejudiced him, he asserts, because not knowing the tuition amount could hinder the court's ability to determine if he is being required to pay for more than the children's proven needs:

> When a child support order that requires payment of child support in excess of the child support guidelines fails to specify the exact amount of support the obligor is required to pay, the calculation necessary to determine whether the orders require the obligor to pay child support in an amount that exceeds 100 percent of the proven needs of the children becomes impossible. TEX. FAM. CODE ANN. § 154.126(b). As David was ordered to pay an unspecified amount of

tuition and fees for the children's private high school tuition, the child support award hinders the ability of the parties to prepare statutory calculations necessary to verify whether the child support award exceeds 100% of the children's proven needs.

We disagree. While David complains that the statutory calculation for determining if ordered support exceeds the children's proven needs cannot be performed, he in fact performed that very calculation in his brief. Relying on the uncontroverted evidence introduced at trial about the children's expenses, DK's high-school tuition, and the estimate of $13,000 for HK's high-school tuition, David calculates the children's monthly proven needs to be between $8,077.18 and $9.376.57.

The approximately $4,500 per month—$2,000 in regular support payments plus approximately $2,500 in private school tuition—David was ordered to pay is well below the proven need range of $8,077.18 to $9.376.57. And, if HK's tuition is higher than the estimated $13,000, the proven needs ranged based on $13,000 would correspondingly increase. We thus do not agree that the uncertainty regarding the amount of HK's tuition might result in David's paying more than 100% of the children's proven needs.

■ David also complains that the court did not demonstrate "good cause" for ordering him to pay annually 100% of the children's private high school tuition and fees in a lump sum. Good cause, he asserts, "contemplates, at a minimum, a connection between the award and the needs of the child or children to be supported." He states that it is "common for parents with children attending private schools to make installment payments specifically sanctioned by the school when paying the children's tuition," and complains that

"there was never a reason provided why David should not be permitted to make monthly payments to the children's high school."

The statutory provision he cites in support of this good cause requirement, however, contains no such limitation on lump-sum awards. *See* TEX. FAM.CODE ANN. § 154.003 (Vernon 2008) (providing that the "court may order that child support be paid by: . . . a lump-sum payment"). And the cases David cite in support involve a predecessor statute to section 154.003 that did contain a good cause requirement. *See Kahn v. Kahn,* 813 S.W.2d 708, 709 (Tex. App.-Austin 1991, no writ) (evaluating whether good cause was shown to support a lump-sum award under former Texas Family Code 14.05(a) (Vernon 1991), which provided that the court "may order either or both parents to make periodic payments or, for good cause shown, order a lump-sum payment"). In any event, it does not appear from the record that David ever requested that the trial court permit him to make periodic tuition payments, and the evidence demonstrated that the tuition policies of DK's high school and one of HK's favored schools do not permit monthly payments. The trial court did not abuse its discretion in ordering the children's tuition payments be made annually in a lump sum.

### E. Trial court findings

David's final two points are directed at the trial court's findings. He first complains that the court failed to make the mandatory findings under section 154.130, which requires the court to state—if requested by a party or if the court varies from the presumptive guidelines—(1) the monthly net resources of the obligor, and (2) the percentage applied to the obligor's net resources for child support. TEX. FAM. CODE ANN. § 154.130 (Vernon 2008). He further asserts that that the trial court

erred by including trust assets, rather than just trust income, when concluding David's "net monthly resources exceed $20,000."

Although David claims that "the trial court findings do not identify the obligor's net resources," the court made the finding that "the net resources available to David F. Kendall exceed $20,000.00 per month." "[W]here a person's income and net resources vary a great deal from month to month, it may only be possible to state a range of net resources." *E.g., Ikard v. Ikard,* 819 S.W.2d 644, 651 (Tex. App.-El Paso 1991, no pet.) (holding statement that obligor's net resources is "between $14,000 and $20,000 per month" was definite enough finding). David's financial information at trial reflected numerous and various sources of cash flow in the form of salaries and various trusts from which David has received varying distributions over the years. In light of this, the court's finding complied with the requirement that the court find the "obligor's net resources." *Id.*

The court further found that the "percentage applied to obligor's net resources for periodic monthly child support does not exceed 50% of net resources." David nonetheless complains that the court should have stated "the percentage applied to the obligor's net resources for child support." When the court cannot calculate a specific amount of obligor's net resources and instead provides a range, it does not have to calculate a percentage applied to obligor's net resources. *Roosth v. Roosth,* 889 S.W.2d 445, 453 (Tex.App.-Houston [14 Dist.] 1994, writ denied).

This Court has also recognized that when the obligor's net resources exceed the guideline range—$7,500 in this case— and the complained-about support is based on the children's proven needs, the court's

order does not represent a variation from the presumptive percentage guidelines. *Hatteberg v. Hatteberg,* 933 S.W.2d 522 (Tex.App.-Houston [1st Dist.] 1994, no writ). Any error by failing to enter more specific findings is harmless, as David has not demonstrated, or even argued, that the lack of more specific findings prevented him "from properly presenting a case to the appellate court." *Stanfield v. Stanfield,* No. 01–05–00379–CV, 2005 WL 3454139, at *2 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (mem. op.)

The trial court's finding that "the monthly net resources available to David F. Kendall include both earned income and substantial resources in the form of trust assets" is likewise harmless. David complains that only trust income, not trust assets, are properly included in "net resources." There was evidence before the court, though, that David's net monthly resources exceed the $7,500 cap without reference to any distributions of trust principal or corpus. And, in cases involving a high income obligor (one having net resources in excess of $7,500), the court may order additional amounts for the proven needs of the children without further reference to the guidelines. TEX. FAM.CODE ANN. § 154.126. Thus, the inclusion of David's trust corpus distributions in the court's "net resource" finding did not weigh in any calculation of support under the guidelines. And David has not articulated any harm he suffered as a result of this alleged error.

## CONCLUSION

We conclude that the trial court had jurisdiction to both enforce and modify the New York Judgment. Finding no abuse of discretion in the trial court's enforcement or modification of David's support obligations, we affirm the trial court's judgment. For the reasons expressed in this opinion, and because this direct appeal provides David an adequate appellate remedy, David's petition for writ of mandamus challenging the trial court's jurisdiction is also denied.